Argued March 11, affirmed April 1, 1919.

## GRAHAM *v*. GRAHAM.

(179 Pac. 661.)

**Appeal and Error—Appeal from "Decree by Confession."**

1. A decree entered pursuant to stipulation that *pro forma* decree may be entered "without prejudice to either party on the appeal of this case" is not a "decree by confession" within Section 549, L. O. L., authorizing appeals from decrees other than decrees by confession.

**Partnership—Accounting—Mistake in Entries of Deceased—Burden of Proof.**

2. Plaintiff, administratrix of deceased partner, has the burden of showing mistakes in entries in the handwriting of her deceased husband in partnership records that he kept.

[As to effect of death of one member of a partnership, see notes in 77 Am. Dec. 114; 86 Am. Dec. 600.]

From Multnomah: GEORGE N. DAVIS, Judge.

Department 2.

Alice M. Graham is the surviving widow and sole heir of R. P. Graham, deceased, and administratrix of his estate. The decedent and the defendant A. S. Graham were brothers and entered into an oral agreement of partnership about April 1, 1887. At that time they leased and operated some farming lands in Columbia County, known as the McGuire place. It is conceded that this partnership continued until March 2, 1892, during which time they purchased and farmed that property. On that date the partnership was dissolved and R. P. Graham executed to A. S. Graham a conveyance of all of his interest in the partnership property in Columbia County, for which the latter gave him his promissory note for over $6,000, the agreed value of the then interest of R. P. Graham in the firm.

At the inception of the partnership both of the Grahams were industrious and hard-working and through their joint efforts accumulated property of the reasonable value of about $12,000. While working in a cannery at Astoria R. P. Graham sustained an injury which prevented him from doing manual labor. For the purpose of studying law he entered the law office of the late Justice MOORE at St. Helens, where he remained one year, and then entered the law office of U. S. Grant Marquam, in Portland, where he finished his studies and was admitted to the bar. He later formed a partnership with T. J. Cleeton. During that time A. S. Graham remained in charge of the farm or home place in Columbia County and did outside work in the canneries and logging camps, for which he received good wages. This money, with the proceeds of

the farm, became a part of the assets of the partnership.

It appears from old letters of R. P. Graham to his brother, written between 1887 and 1892, that after he commenced the stuly of law he ceased to be an asset and became a liability of the firm; that he had the usual experience of the young man who studies law and starts out in search of clients, and that it was for such reason that he sold his interest in the property of the firm to his brother. While his testimony is not clear, A. S. Graham contends that at different times between 1892 and 1895 he made various payments on the $6,000 note and that in 1895 there was an unpaid balance of from $2,500 to $3,000 thereon, at which time the brothers had a conference and apparently renewed their mutual relations. The note was then destroyed, but A. S. Graham never reconveyed any interest in the home place to his brother and there is no explanation in the record of any accounting between them as to the amount which A. S. Graham paid on the note. The brothers had numerous mutual dealings and each had absolute confidence in the other. R. P. Graham kept the accounts of the partnership. During this time they bought and sold many pieces of property, involving many thousands of dollars, and as a rule the money passed through the hands of R. P. Graham. A large portion of it represented the earnings of A. S. Graham and the proceeds of the farm and sales of different properties. There is no claim or pretense that after he was admitted to the bar R. P. Graham ever rendered an account of his law business to his brother or that the latter ever shared in that business.

After the death of R. P. Graham on September 28, 1912, Alice M. Graham was appointed administratrix of his estate and brought three different suits: First,

one against A. S. Graham; second, against A. S. Graham et al.; and third, against Anna Breck and A. S. Graham. The main purpose of the first suit was to have an accounting from A. S. Graham, and of the second, known as the "swamp-land case," for an accounting for $20,000 for the sale of over one thousand acres of land by A. S. Graham and others to the Columbia Agricultural Company. This suit was dismissed as to the defendants First National Bank of Astoria and Columbia Agricultural Company. The third suit is known as the "Hanson's Addition" or Breck case, in which the plaintiff claims that she is the sole owner of Lots 5 and 6 in Block 10 of Hanson's Addition to Portland, subject to a mortgage thereon of $5,600. After they were all at issue the three cases were consolidated and tried as one suit, and for the purpose of taking testimony were heard before a referee who made findings of fact and conclusions of law.

The plaintiff and the defendants joined in the abstract of record and the substance of the pleadings only is set out. After the referee made his findings both the plaintiff and the defendants requested modified findings. The consolidated case was submitted to the Circuit Court. It appeared that the trial judge was soon to leave the bench and enter the army. To avoid delay and secure his early decision, the attorneys entered into the following stipulation:

"It is stipulated in open court that a *pro forma* decree may be entered herein by the court, confirming the report of the referee, without prejudice to either party on the appeal of this cause to the Supreme Court."

The referee found in substance, and the court decreed, that the plaintiff is the owner of Lots E, F, 19 and 20 in Block 16 of Alameda Park in Portland, subject to a lien in favor of A. S. Graham for $1,048.89;

that the plaintiff and A. S. Graham are the equitable owners of Lots 5 and 6, Block 10 of Hanson's Addition to Portland, subject to the Annie Breck claim of $5,600 with accrued interest, and that on this claim A. S. Graham should pay the plaintiff $179.22 and account to her for one half of the net rent after February 26, 1917; that A. S. Graham is the owner of the home place in Columbia County; that he is the owner of a $3,400 mortgage on Lot 1, Block 60 in Vernon, in which the plaintiff has an equity of $687; that he is the owner of Lots 47 and 48 of Block 4, Mt. Tabor Place, which plaintiff has an option to purchase within six months, upon payment to A. S. Graham of $467.82; that the latter is the sole owner of Lot 6 and the north half of Lot 5 in Block 28 of Sunnyside; that the plaintiff is the owner of an undivided one-third interest in Lots 8, 9, 14 and 15 in Block 72 of Sellwood; that A. S. Graham owns an undivided one-sixth interest therein; that he is the owner of 60 shares of Alameda Land Company's stock, of the par value of $6,000, which the plaintiff has an option to purchase at any time within six months, at $3,000 with interest at 6 per cent from April 4, 1908; that James Wallace have judgment against the estate of R. P. Graham for $1,165 and interest thereon at 6 per cent per annum since September 28, 1912; that R. D. Kent have judgment against the estate of R. P. Graham for the sum of $1,318.60, with interest thereon from September 28, 1912, at 6 per cent per annum, and that all of the property rights decreed the plaintiff are subject to the debts of the estate of R. P. Graham. The court also decreed mutual setoffs to the amounts thereof, between the above claims of the plaintiff and A. S. Graham. Both parties appealed and the defendants filed a motion to

dismiss the plaintiff's appeal, contending that it is from a decree rendered by confession.   AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. W. Y. Masters.*

For respondents there was a brief over the names of *Mr. George D. Young, Mr. Horace B. Nicholas, Mr. W. C. Nicholas* and *Mr. R. W. Nicholas,* with oral arguments by *Mr. Young* and *Mr. Horace B. Nicholas.*

JOHNS, J.—Section 549, L. O. L., provides:

"Any party to a judgment or decree other than a judgment or decree given by confession, or for want of an answer, may appeal therefrom. * * *"

1. It is very apparent that the stipulation was for the mutual interests of both parties; that it was entered into so that the trial judge could render a decree before he retired from the bench, and that it was intended that either party should have the right of appeal. Under the circumstances, such a decree is not one "by confession" within the meaning of Section 549. There is no merit in the motion to dismiss.

One of the important controversies is over the 1,031 acre tract of swamp-land in Columbia County which was sold to the Columbia Agricultural Company at an agreed price of $20,000, or an average of about $20 per acre. Of this amount, the referee found that Maud Graham and James Wallace furnished 465 acres at a valuation of $5,000; A. S. Graham, 200 acres valued at $4,000; R. D. Kent, 100 acres valued at $2,000; R. P. Graham, 120 acres valued at $600, and A. S. Graham and R. P. Graham jointly, 146 acres valued at $8,400. It is agreed that Maud Graham and James Wallace were to have $5,000 for their 465 acres, but it is con-

tended that the plaintiff is entitled to an undivided one-half interest in the 200 acre tract valued at $4,000; that the 120 acres of R. P. Graham had a much greater value than $600 and that out of the moneys by him received A. S. Graham should pay R. D. Kent one half of the $2,000 for the 100-acre tract. The proceeds of the entire sale were divided as follows: To Maud Graham and James Wallace, 12½ per cent each; to R. P. Graham, 24 per cent; to R. D. Kent, 10 per cent, and the remaining 41 per cent to A. S. Graham. The referee found that including the interest R. P. Graham had collected $13,880 of the purchase price; that A. S. Graham had collected $9,664.16, making a total of $23,544.16; that Maud Graham had received her money in full; that James Wallace had received only $570; that at the time of his death there was due from R. P. Graham to him the sum of $1,165 with interest at 6 per cent from September 28, 1912; that R. D. Kent had never received any of his money and was entitled to $1,388 from the estate of R. P. Graham, less 5 per cent commission, with interest at 6 per cent from the date mentioned, and that A. S. Graham had received all of his money except $568.56, which amount he should also receive from the estate of his brother.

The testimony is not very satisfactory and is somewhat confusing. In a large measure it depends upon the books kept by R. P. Graham and the veracity of A. S. Graham. There was no written partnership agreement. After a careful reading of the voluminous record and an examination of the numerous exhibits, we are convinced that in the main the testimony of A. S. Graham is true as to all of the matters within his personal knowledge. While some of his testimony is not very clear, a large portion of it is his per-

sonal recollection of transactions covering a period of twenty-five years, which would be impossible for anyone correctly to remember or give in detail.

The entire tract was sold on the basis of $20 per acre, out of which Maud Graham and James Wallace were to receive only $5,000 for 465 acres and the testimony shows that the 120-acre tract of R. P. Graham was not worth more than $5 per acre and that the A. S. Graham tract of 200 acres and the R. D. Kent tract of 100 acres were reasonably worth $20 per acre. On such valuations this would leave $8,400 which the Grahams would receive for their 146-acre tract, or approximately $57.50 per acre. This would be a liberal compensation for their services in making the deal.

The following entry appears in the handwriting of R. P. Graham under the A. S. Graham account on page 112 of Ledger number 44 for the year 1899:

"Feby. 11.   By Cash on dep.   94   344/04."

The figures "94" refer to page 94 of Blotter number 43 for the same year, where the following entry appears in the handwriting of R. P. Graham:

"11
Cash to A. S. G.   344/04
     Cash on deposit & Alaska $18.00   344/04."

This was approximately four years after the $6,000 note was destroyed and would clearly indicate that on February 11, 1899, there was a balance of $344.04 due from R. F. Graham to A. S. Graham.

While it is true that there is some testimony of certain statements of R. P. Graham which would tend to show that he had or claimed some interest in the home place, this is more than offset by the testimony for the defendant A. S. Graham and it is worthy of note that as between A. S. Graham and R. P. Graham there is no testimony in the record which would show that the

latter ever had anything to do with the home place or farm subsequent to 1900; that he claimed any interest in or ever exercised any actual ownership over it, or that after that year he ever kept any "account" of the farm.    A. S. Graham testifies:

"It was a mutual understanding between us that I was to have the home place and he was to have his place up here, even before we tried to settle.   We had that understanding from the time we started out.   We were each to have a home and he put his in his wife's name."

According to the theory of the plaintiff, R. P. Graham and A. S. Graham would have been full partners in all of their business and personal affairs from 1887 until the death of R. P. Graham on September 28, 1912, and each would have shared in all profits and losses, which from necessity would have included the Seaside property and the Irvington residence in the name of the plaintiff, the law business and library of R. P. Graham and the loss of about $5,000 which A. S. Graham sustained in a logging contract.   Yet there is nothing in any of the records or account-books kept by either of them which would tend to show that any firm account of such matters was ever kept; that there was ever an adjustment of these affairs between them or that A. S. Graham ever had or claimed any title or interest in the Irvington home, Seaside property, law business or personal holdings of his brother.

The deceased was an attorney by profession and knew the force and effect of the deed which he executed for his interest in the home place to his brother on March 2, 1892.   He was ill for some time before he died, yet there is no proof that for twenty years he ever demanded or requested a reconveyance or that he be furnished any evidence of his title.   If the home place was the property of the partnership it is not rea-

sonable to believe that A. S. Graham would have the sole and exclusive management of the farm for the last ten years without keeping or rendering a firm account of its expenses and income. Yet there is no evidence that any such account was ever kept or rendered or that any demand was made for a firm account of the farm during the last ten years.

Although there is some evidence that after the death of her husband the plaintiff was told by A. S. Graham that $5,000 should be paid out of the swamp-land deal to Maud Graham and James Wallace, and $7,500 each to A. S. Graham and R. P. Graham, this is flatly denied by A. S. Graham and could not have been so if Kent was to receive $2,000 for his 100 acres, and the testimony is conclusive that Kent was the owner of that land and was to receive the amount mentioned for his interest.

The court should be slow to convey from one claimant to another the record title of lands which as between the living was vested in the survivor for twenty years, on parol testimony only, which is neither clear nor convincing.

2. The remaining questions are largely evidenced by entries in the handwriting of the deceased in the records that he kept, which are explained and corroborated by independent testimony that strongly supports the findings of the referee. It may be that in such a mass of figures covering a period of twenty-five years mistakes were made, but the burden of proof is on the plaintiff. It is very significant that during that long period and in all of their mutual dealings there was never any dispute or controversy between the brothers; that all of the main records of their transactions were kept by the brother now deceased, and that A. S. Graham had but little knowledge of such matters and in a

very large measure was dependent upon the accounts kept by his brother.

After a careful reading of the testimony and an examination of the numerous books, checks and vouchers, we are of the opinion that the plaintiff has failed in her proof and that the findings of the referee are substantially correct. It is contended by the defendants that some slight errors were committed against them by the referee, but, all things considered, the decree of the Circuit Court is affirmed, and neither party is allowed costs in either court.            Affirmed.

McBride, C. J., and Bean and Bennett, JJ., concur.